IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KYLA GORJI, | | |
| | Plaintiff, | **4:21CV3134** |
| vs. | | **ORDER** |
| C.R. BARD, INC., A Corporation; BARD ACCESS SYSTEMS, INC., A Corporation; and BECTON, DICKINSON AND COMPANY, A Corporation | | |
| | Defendants. | |

This matter comes before the Court on Defendants' Motion to Strike the Amended Complaint's Prayer for Punitive Damages (Filing No. 22). Defendants move the Court for an order under Rule 12(f) of the Federal Rule of Civil Procedure striking Plaintiff's request for punitive damages from her Amended Complaint (Filing No. 11). For the following reasons, the Court will grant the motion.

**BACKGROUND**

Plaintiff, a resident of Lincoln, Nebraska, filed the instant action against Defendants seeking damages she claims to have sustained from the placement of a port/catheter system designed, manufactured, marketed, and sold by Defendants. (Filing No. 11). Defendant C.R. Bard, Inc., a New Jersey corporation, and Defendant Bard Access Systems, Inc. ("BAS"), a Utah corporation, are wholly owned subsidiaries of Defendant Becton Dickinson and Company, a New Jersey corporation. (Filing No. 11 at pp. 1-2; Filing No. 24 at pp. 1-2). Defendants are engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce medical devices, including the device at issue, the Bard PowerPort isp M.R.I. Implantable Port ("PowerPort"). (Filing No. 11 at pp. 1-2). Defendants conduct substantial business in Nebraska, and BAS distributes vascular access products in Nebraska. (Filing No. 24 at p. 2).

The PowerPort is an implantable vascular access device designed to allow repeated access to a patient's vascular system for administration of medication, intravenous fluids, parenteral nutrition solutions, and blood products. (Filing No. 11 at p. 3). The PowerPort is used in treating

cancer patients receiving chemotherapy or rheumatoid arthritis patients requiring long-term medication infusions.  (Filing No. 11 at p. 4).

On October 1, 2019, Plaintiff underwent placement of the PowerPort.  On October 17, 2019, after it was discovered the PowerPort had fractured and the tip had migrated into Plaintiff's heart, she underwent a fluoroscopically guided retrieval of the fractured tip and catheter at Bryan Medical Center West in Lincoln, Nebraska.  The next day while still at Bryan Medical Center, Plaintiff underwent removal of the PowerPort and a new device from a different manufacturer was implanted in her right jugular.  (Filing No. 11 at p. 8).

Plaintiff alleges Defendants obtained clearance to market the PowerPort pursuant to § 510(k) of the Medical Device Amendments ("MDA") to the Food, Drug, and Cosmetic Act ("FDCA").  Section 501(k) allows a manufacturer to market a medical device that is substantially equivalent to other legally marketed predicate devices without a formal safety or efficacy review.  Once a product is cleared under § 510(k), the manufacturer has a continuing obligation to investigate and report any adverse events associated with the device and must periodically submit any new information to the Food and Drug Administration ("FDA") that may affect its previous safety and efficacy conclusion.  (Filing No. 11 at pp. 4-5).  Plaintiff then alleges that after the PowerPort was put on the market, Defendants received several adverse event reports from healthcare providers, including reports the PowerPort was fracturing, migrating, and otherwise malfunctioning after implantation, causing perforations of internal vasculature, and resulting in patient injuries such as hemorrhage, cardiac tamponade or arrhythmias, and persistent pain.  (Filing No. 11 at p. 6).

Plaintiff further alleges as follows:  Defendants submitted thousands of device adverse event reports to the Alternative Summary Reporting ("ASR") program which, according to the Plaintiff, was a controversial reporting system that effectively concealed reported PowerPort failures from medical professionals and patients; the FDA halted the ASR program in 2019 after a multipart investigative journalism piece published in a prominent health news publication prompted widespread outcry from medical professionals and patient advocacy groups; (Filing No. 11 at p. 6); Defendants intentionally concealed the severity of complications caused by the PowerPort device and the likelihood of such events occurring in the future by failing to submit the adverse event reports it received to the publicly available Manufacturer and User Facility Device Experience ("MAUDE") database; (Filing No. 11 at p. 7); and rather than alter the design of the PowerPort or

adequately warn physicians of its danger, Defendants "continued to actively and aggressively market the PowerPort as safe," despite their knowledge of numerous reports of catheter fracture and migration.   Plaintiff asserts Defendants' conduct "constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff." (Filing No. 11 at p. 7).

Plaintiff's prayer for relief seeks several types of damages for her injuries, including punitive damages.   (Filing No. 11 at p. 22).   Defendants initially asked the Court to dismiss Plaintiff's prayer for punitive damages in their motion to dismiss filed under Rule 12(b)(6).  (Filing No. 13 at p. 1).  The Court denied Defendants' request because "Rule 12(b)(6) functions to dismiss claims—not prayers for relief."  The Court stated it would consider a motion to strike the prayer for punitive damages at the appropriate time.  (Filing No. 21 at p. 10).  That is the matter now before the Court.

Defendants move to strike Plaintiff's prayer for punitive damages because punitive damages are prohibited under Nebraska law.   (Filing No. 23 at p. 2).   Plaintiff opposes the motion and contends there is a true conflict of laws in this case with respect to punitive damages.  Plaintiff argues that under Nebraska's "most significant relationship" choice-of-law rules, New Jersey or Utah has a more significant interest in punishing willfully bad actors incorporated in their states. (Filing No. 27 at pp. 3-5).  Plaintiff also argues that Defendants' Motion to Strike is premature as no discovery has taken place and it is unclear at this point whether such punitive damages are appropriate.  (Filing No. 27 at p. 2).

## ANALYSIS

Defendants first argue Plaintiff has waived her choice-of-law argument by failing to raise it in response to Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's prayer for punitive damages. (Filing No. 28 at pp. 1-2).  However, as Judge Gerrard stated in his Memorandum and Order, "Rule 12(b)(6) functions to dismiss claims—not prayers for relief," and specifically recognized the punitive damages issue is more appropriately considered on a motion to strike under Rule 12(f). As such, Plaintiff's failure to raise a choice-of-law argument in response to Defendants' improper motion to dismiss Plaintiff's prayer for punitive damages did not result in a waiver of that argument.

Rule 12(f) of the Federal Rules of Civil Procedure permits courts to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R.

Civ. P. 12(f).  "Judges enjoy liberal discretion to strike pleadings under Rule 12(f)." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (citing *Nationwide Ins. Co. v. Cent. Mo. Elec. Coop., Inc.*, 278 F.3d 742, 748 (8th Cir. 2001)).  "Striking a party's pleading, however, is an extreme and disfavored measure." *Id.* (citing *Stanbury L. Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000)).  "[T]he rule's purpose is to conserve time and resources by avoiding litigation of issues which will not affect the outcome of a case." *Williams v. Averitt Express*, No. 8:15CV464, 2016 WL 589861, at *2 (D. Neb. Feb. 11, 2016).  Motions to strike are generally disfavored, but "[a] prayer for relief not available under applicable law, or which asserts a damage claim in excess of the maximum recovery permitted by law, is properly subject to a motion to strike." *Knight v. Nash-Finch Co.*, No. 8:12CV404, 2014 WL 12576235, at *1 (D. Neb. Feb. 5, 2014).

In a diversity case, the court applies the choice-of-law rules of the forum state—in this case, Nebraska.  *Schaffart v. ONEOK, Inc.*, 686 F.3d 461, 475 (8th Cir. 2012) (citing *Ferrell v. W. Bend Mut. Ins. Co.*, 393 F.3d 786, 796 (8th Cir. 2005)) ("In this diversity case, we apply the choice of law rules of Nebraska, the forum state.").  In Nebraska, "[t]he first step in a conflict-of-law analysis is to determine whether there is an actual conflict between the legal rules of different states." *Johnson v. U.S. Fid. & Guar. Co.*, 736, 696 N.W.2d 431, 436 (Neb. 2005).  "An actual conflict exists when a legal issue is resolved differently under the law of two states." *Id.*  The court proceeds to apply choice of law rules if the court concludes "an actual conflict exists." *Id.* at 437.

Under Nebraska law, "punitive, vindictive, or exemplary damages contravene Neb. Const. art. VII, § 5, and thus are not allowed in this jurisdiction." *O'Brien v. Cessna Aircraft Co.*, 903 N.W.2d 432, 458 (Neb. 2017) (quoting *Distinctive Printing & Packaging Co. v. Cox*, 443 N.W.2d 566, 574 (Neb. 1989)).  In New Jersey (where C.R. Bard is incorporated), a plaintiff may be awarded punitive damages if the plaintiff "proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J. Stat. Ann. § 2A:15-5.12(a) (West 2021).  Punitive damages are also available under Utah law (where BAS is incorporated) if a plaintiff is awarded compensatory or general damages and establishes "by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." Utah Code Ann. § 78B-8-201(1)(a) (West 2021).

Therefore, there is an actual conflict between the laws of Nebraska and New Jersey as well as between the laws of Nebraska and Utah. Accordingly, the Court must apply Nebraska's choice of law rules. See *Dubas v. Clark Equip. Co.*, 532 F. Supp. 3d 819, 830 (D. Neb. 2021) (citing *Johnson*, 696 N.W.2d at 437).

Nebraska courts resolve conflicts of law involving tortious conduct and damages by applying the "most significant relationship" test enumerated in the Restatement (Second) of Conflict of Laws § 145 (1971). See *O'Brien*, 903 N.W.2d at 459 (applying the most significant relationship test in a personal injury case); see also Restatement (Second) of Conflict of Laws § 145(1) ("The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."). Section 6 of the Restatement sets forth the policy considerations courts should consider in determining which state has the most significant relationship, including:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflicts of Laws § 6. Section 145 provides that the contacts to be considered in determining which forum has the most significant relationship include:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties:
> (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145; see also *Dubas*, 532 F. Supp. 3d at 830-31; *O'Brien*, 903 N.W.2d at 459. "The Restatement cautions, however, that these contacts are not to be given equal weight mechanically, but should each be considered in light of their relative importance with respect to the particular issue under consideration." *O'Brien*, 903 N.W.2d at 459. With respect to punitive damages, "'The law selected by application of the rule of § 145 determines

the right to exemplary damages.'" *O'Brien*, 903 N.W.2d at 459 (quoting Restatement (Second) of Conflict of Laws § 171 cmt. d).

In *O'Brien v. Cessna Aircraft Co.*, the Nebraska Supreme Court applied the most significant relationship test and concluded Nebraska law rather than Kansas law governed the question of whether punitive damages were available to the plaintiff. 903 N.W.2d at 460. In *O'Brien*, a commercial pilot sustained serious injuries in a plane crash during February in Nebraska, which he alleged were caused by defects in the plane's pneumatic deicing system. The pilot brought a products-liability action against the aircraft's designer and manufacturer and against the designer and manufacturer of the aircraft's pneumatic deicing system on theories of strict liability, negligence, and fraudulent misrepresentation. *Id.* at 444-45. The Nebraska Supreme Court found the district court did not err in applying the Restatement factors in § 145 and agreed with the conclusion that there were "numerous, strong contacts to Nebraska that inform Nebraska's interest in applying its laws to the issue of punitive damages." *Id.* at 460. Despite the fact that "important decisions and product manufacture took place at the [defendant's] headquarters in Kansas," the overall weight of the contacts pointed toward Nebraska having the most significant relationship on the issue of punitive damages because the pilot's injury occurred in Nebraska; the pilot resided in Nebraska; the flight was over a regular route in Nebraska; the pilot's injuries were treated in Nebraska; the pilot's employer who owned the plane was a Nebraska resident; and the "product at issue as operated at all relevant times within the borders of Nebraska and the alleged product failures took place in [Nebraska]." *Id.*

In *Dubas v. Clark Equip. Co.*, a Nebraska man, injured after his leg was run over by a Bobcat skid-steer loader, sued its North Dakota-based manufacturer for negligence and strict liability based on the lack of a rear-view camera system on the skid loader. The man and his wife sought damages for his injuries, including punitive damages under North Dakota law because the defendant's policy decision "to place profit over safety" was made in North Dakota, the defendant's principal place of business. *Dubas*, 532 F. Supp. 3d at 830. This court nevertheless struck the plaintiffs' prayer for punitive damages after determining that Nebraska had the most significant relationship to the occurrence and the parties. In weighing the Restatement factors as set forth by *O'Brien*, the court considered:

> The injury occurred in Nebraska, the [plaintiffs] are domiciled in Nebraska, [the defendant] conducts business in Nebraska and is registered to do business in Nebraska. The relationship between the parties is centered around [the defendant's]

conduct of business in Nebraska and delivery of an allegedly defective product to a Bobcat dealership in Grand Island, Nebraska, which is where the [plaintiffs] sustained injuries.

*Id.* at 831-32. The court determined the balance of these Nebraska connections outweighed the fact that the defendant "made some business decisions in North Dakota where it is headquartered[.]" *Id.*

In support of their Motion to Strike, Defendants point out that Nebraska law prohibits punitive damages. In response, Plaintiff argues Defendants' home states, Utah and New Jersey, have interests in punishing willfully bad actors, and the occurrence of Plaintiff's injury in Nebraska is merely fortuitous. Underlying policy reasons of conflicting rules is an important factor in determining the most significant relationship under Nebraska law. *Malena v. Marriott Int'l, Inc.*, 651 N.W.2d 850, 857 (Neb. 2002)). And, because the general purpose of punitive damages is punishment or retribution and deterrence, Plaintiff argues Utah and New Jersey have interests in punishing potential willfully bad actors incorporated in their states, citing *Fanselow v. Rice*, 213 F. Supp. 2d 1077, 1085 (D. Neb. 2002)("[T]the polices of states that allow punitive damages are advanced when defendants with significant contacts to them are punished for and deterred from bad behavior.").

In *Fanselow*, the court found that the only connection between the parties and Nebraska was a traffic accident that occurred in Nebraska. The plaintiffs in *Fanselow* were residents of Colorado, Massachusetts, and California, while the defendants were a truck driver from Oregon and a shipping company based in Minnesota. *Fanselow*, 213 F. Supp. 2d at 1078. The defendants argued that, under the most significant relationship test, the Nebraska constitutional prohibition of punitive damages was a stronger policy than the Minnesota or Oregon statutes allowing punitive damages, which tipped the scales toward applying Nebraska law. *Id.* at 1083. The court applied the § 145 contacts and the factors in § 6 of the Restatement (Second) Conflict of Laws and held that because the only connection to Nebraska was the location of the accident, the respective policy reasons for allowing punitive damages in Minnesota and Oregon outweighed the Nebraska policy reasons for disallowing them, tilting in favor of Minnesota and Oregon law having the most significant relationship to the defendants. *Id.* at 1083-86.

The present case is more analogous to both *O'Brien* and *Dubas* than to *Fanselow*. Here, the parties and Plaintiff's claims have more contacts to Nebraska than Plaintiff's place of injury. Plaintiff is a resident of Lincoln, Nebraska. Plaintiff's injuries occurred in Nebraska. Plaintiff's

injuries were treated in a Nebraska hospital.  Defendants do substantial business in Nebraska and distribute their products in Nebraska, much like the defendant manufacturer in *O'Brien*.  Although Defendants here are, respectively, Utah and New Jersey corporations and have made business decisions in those states, this does not outweigh the contacts to Nebraska or Nebraska policy regarding punitive damages in this case.  Given that the other states' provisions allowing punitive damages are "strictly statutory," such statutory provisions do not outweigh the compelling force of the Nebraska constitution.  Here, Nebraska has the most significant relationship to the action.  And Nebraska policy is clear: "'[P]unitive, vindictive, or exemplary damages contravene Neb. Const. art. VII, § 5, and thus are not allowed in this jurisdiction.'" *O'Brien*, 903 N.W.2d at 458 (quoting *Distinctive Printing & Packaging Co.*, 443 N.W.2d at 574 (Neb. 1989)).

Finally, although Plaintiff asserts Defendants' motion to strike is premature, it is not clear to the court what additional evidence could be found in discovery that would outweigh Nebraska's "clear constitutional prohibition" against punitive damages and Nebraska's relationship to this case. Accordingly,

**IT IS ORDERED**:  Defendants' Motion to Strike (Filing No. 22) is granted.  Plaintiff's request for punitive damages in her Amended Complaint (Filing No. 11) is stricken.

Dated this 28th day of February, 2022.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

8